UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-11201-RGS

MIGDALIA GONZALEZ

v.

DANIEL KEELER et al.

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

September 29, 2009

STEARNS, D.J.

Migdalia Gonzalez, individually and as administrator of her father Luis Gonzalez's

(Luis) estate, filed suit on June 29, 2007, against defendants Thomas Antonino, Daniel

Keeler, and William Slyne.  Antonino and Slyne are Boston Police patrol officers.  Keeler

is a Boston Police sergeant detective.

Gonzalez alleges that defendants violated Luis's civil rights under 42 U.S.C. § 1983

and § 1988, the Federal Civil Rights Act (FCRA) (Count I), and M.G.L. c. 12, § 11H-I, the

Massachusetts Civil Rights Act (MCRA) (Count II), by using excessive force to disarm him

during a violent confrontation.[1]  The Complaint also alleges that the officers were at fault

for failing to communicate with Luis in Spanish (his native language).[2]  Defendants have

---

[1]The court dismissed claims of intentional infliction of emotional distress, wrongful death, and civil assault and battery in an Order dated February 7, 2008.  Pursuant to a stipulation filed with the court on May 28, 2009, originally named defendants Warren Hoppie and Thomas Foley, also Boston Police officers, were dismissed from the Complaint with prejudice.

[2]There is no apparent constitutional or statutory basis for the proposition that police were required to communicate with Luis in Spanish and plaintiff does not suggest one.

filed separate motions for summary judgment and have also asserted a defense of qualified immunity.  The court heard oral argument on September 1, 2009.

FACTUAL BACKGROUND

The facts viewed in the light most favorable to Gonzalez are as follows.  On July 2, 2004, Keeler was the supervisor of detectives for Boston Police Area D-4.  Officers Antonino and Slyne were working as patrolmen on the 4:00 PM to midnight shift.  At approximately 10:30 PM, Boston Police received a 911 call reporting a man attempting to cut himself at 626 Tremont Street in Boston.  Keeler, Slyne, and Antonino responded. Boston Police officers had previously responded to incidents involving Luis and were generally aware that he suffered from mental and psychological problems.

Upon arriving at 626 Tremont, a multi-unit apartment building, the officers proceeded to Luis's apartment.  Neighbors informed the officers that Luis's sister was most likely inside the apartment.  The officers knocked at the door several times, identifying themselves as police.  They repeatedly asked Luis to open the door.  They could hear sounds of movement from inside the apartment, but received no response to their requests.  Pedro Cotto, who identified himself as a friend of Luis, approached the officers and offered to speak with Luis in Spanish.  The officers declined Cotto's offer to help.[3]

The officers then called for assistance from the Boston Fire Department.  Firemen forced open the door to the apartment and left the scene.  The officers entered the apartment, again announcing their identity.  While searching for Luis, they found his sister

---

[3]There are (non-material) factual disputes whether the officers ignored Cotto, or whether Cotto attempted unsuccessfully to communicate with Luis, and whether Cotto voluntarily left the scene or was forcibly taken away by the officers.

2

sitting on a bed in a back bedroom.  The sister was non-responsive.[4]  Detective Keeler located Luis in a second bedroom.  Luis was holding a knife.  Keeler ordered Luis to drop the knife and come out of the bedroom.  When Luis failed to comply, Keeler sprayed him with oleoresin capsicum spray (OC spray).  Detective Keeler, overwhelmed by the OC fumes, retreated from the bedroom to a front room of the apartment.

Slyne and Antonino then entered the bedroom.  Luis was now crouched in a closet. As Slyne approached, Luis brandished two knives in a threatening manner.  Slyne attempted to use the closet door as a shield, and then jumped on the bed to put distance between himself and Luis.  Antonino backed up against the wall and drew his service revolver.  Both Slyne and Antonino demanded that Luis put down the knives.  Luis began striking the closet door with a knife.  He then advanced towards Antonino waving the knives.  Both officers discharged their firearms, fatally wounding Luis.  Boston Emergency Medical Services was called.  Luis was taken to Boston Medical Center where he was pronounced dead.  Keeler was not in the bedroom when Luis was shot and did not witness the confrontation between Luis and officers Slyne and Antonino.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Gaskell v. Harvard Co-op Soc., 3 F.3d 495, 497 (1st Cir. 1993).  "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party."  Rodriquez-Pinto

---

[4]The sister is also mentally ill.

v. Tirado-Delgado, 982 F.2d 34, 38 (1st Cir. 1993).  To succeed, the moving party must

show that there is an absence of evidence to support the nonmoving party's position.

Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).

To establish a violation of civil rights under 42 U.S.C. § 1983, a plaintiff "must show

by a preponderance of the evidence that: (1) the challenged conduct was attributable to

a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights

secured by the Constitution or laws of the United States."  Velez- Rivera v. Agosto-Alicea,

437 F.3d 145, 151-152 (1st Cir. 2006).[5]  Similarly, "[t]he MCRA provides a cause of action

for any person whose rights under the Constitution, federal law, or state law have been

interfered with by threats, intimidation, or coercion of another."  Mass. Gen. Laws ch. 12,

§11I; Kelley v. LaForce, 288 F.3d 1, 10 (1st Cir. 2002).[6]

"[A]ll claims that law enforcement officers have used excessive force – deadly or not

– in the course of an arrest" are to be decided under a Fourth Amendment standard of

reasonableness, the proper application of which "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether

---

[5]That defendants were acting under color of state law for the purposes of the FCRA is not in dispute.  The MCRA contains no "color of law" element.

[6]Gonzalez does not challenge the entry of the apartment, conceding that police had exigent circumstances (or sufficient justification under the emergency aid doctrine) to enter without a warrant.  See Mincey v. Arizona, 437 U.S. 385, 392 (1978); Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006).  See also McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996).  Although the Complaint alludes to the Eighth Amendment's "Cruel and Unusual Punishments" clause, the Eighth Amendment applies only to prisoners serving a committed sentence.  Graham v. Connor, 490 U.S. 386, 395 n.10 (1989); Wilson v. Seiter, 501 U.S. 294, 297 (1991).

he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396 (1989) (rejecting a Fourteenth Amendment substantive due process analysis of excessive force claims).   The standard is an objective one: "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." <u>Id.</u> at 396-397.  <u>See</u> <u>Menuel v. City of Atlanta, Georgia</u>, 25 F.3d 990, 996 (11th Cir. 1994) (officers attempting to subdue a violent, mentally ill suspect acted reasonably in resorting to deadly force after she unexpectedly shot at them at close range in a darkened bedroom).  <u>Cf.</u> <u>Roy v. City of Lewiston, Maine</u>, 42 F.3d 691, 695 (1st Cir. 1994) ("[W]hether substantive liability or qualified immunity is at issue, the Supreme Court intended to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases.").  <u>See also</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 638-639 (1987) (immunity protects "all but the plainly incompetent or those who knowingly violate the law" or whose acts are "clearly proscribed.").  <u>Compare</u> Cruz v. City of Laramie, Wyoming, 239 F.3d 1183, 1188 (10th Cir. 2001) (hog-tying persons of obvious diminished capacity is a presumptively unreasonable use of force given the susceptibility of intoxicated persons and the mentally ill to lethal breathing problems).

Qualified immunity attaches to discretionary conduct of government officials that

5

"does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officers immune unless their actions were "clearly proscribed" by established law).  "Defendant police officers are shielded if either of the following holds:  if the federal law allegedly violated was not clearly established at the time of the alleged violation, or if, at summary judgment, there is no genuine dispute of material fact that would prevent a finding that the defendants' actions, with regard to applying or following such clearly established law, were objectively reasonable."  Vargas-Badillo v. Diaz Torres, 114 F.3d 3, 5 (1st Cir. 1997) (emphasis in original).  See also Pearson v. Callahan, 129 S.Ct. 808, 821 (2009) (in addressing the elements of qualified immunity, a trial court is at liberty to proceed in the sequence that appears most appropriate to the facts of the case at hand).  While determinations of reasonableness are usually reserved for juries, qualified immunity is an exception. Roy, 42 F.3d at 694. "[T]he objective reasonableness determination [in a qualified immunity analysis] is for a judge to make and not for the jury." Hall v. Ochs, 817 F.2d 920, 924 (1st Cir. 1987).

The First Circuit decision most closely in point is Roy.  In that case, police responded to a report of a domestic disturbance. When they arrived, they found Roy drunk and armed with two knives.  He refused to obey the officers' repeated commands to put down the knives.  Roy instead advanced towards the officers, flailing his arms, and holding the knives.  When Roy lunged at one of the officers (Whalen), the officer shot him twice wounding him seriously, but not mortally.  Roy brought suit contending that the officers had used excessive force under the circumstances.  On a motion for summary judgment, the

district court found that the officers' conduct was both objectively reasonable and protected

by qualified immunity.

The First Circuit agreed with the district court on both points, including the finding

for officer Whalen.

> [W]e think that the district court properly granted summary judgment on the section 1983 claim in favor of Whalen.  Perhaps a jury could rationally have found that Whalen could have done a better job, but in our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as Whalen - in circumstances that were assuredly "tense, uncertain, and rapidly evolving . . . ." Graham, 490 U.S. at 397.   Put differently, Whalen's actions, even if mistaken, were not unconstitutional.
>
> Roy was armed; he apparently tried to kick and strike at the officers; he disobeyed repeated instructions to put down the weapons; and the officers had other reasons, already described, for thinking him capable of assault. Apart from the suggestion that mace should be carried by all policemen, Roy's expert nowhere explains in his affidavit how the police could have subdued Roy; and it is not obvious that it would have been a better solution (as the expert seems to suggest) for the police to retreat, leaving an intoxicated armed man on the premises – one who had just now committed an apparent felony in the presence of the police.
>
> Nor is it at all plain that the police could, or should, have kept their distance. Leaving aside the indications that Roy moved toward them, one might easily suppose that the best chance the police had to subdue him without shooting was to get close enough to push him over or wrest the weapons from him. The police may have done the wrong thing but they were not "plainly incompetent" nor were their actions "clearly proscribed." Anderson, 482 U.S. at 638.

Roy, 42 F.3d at 695-696.[7]

This case is virtually indistinguishable from Roy.  As a consequence, the court has

no choice but to enter judgment for defendant's both for lack of a constitutional violation

---

[7]Unlike the case in Roy, the police here attempted (unsuccessfully) to use mace to subdue Luis.

and on grounds of qualified immunity.[8]

ORDER

For the foregoing reasons, defendants' motions for summary judgment are ALLOWED.  The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[8]The court recognizes the tragic circumstances of this case.  It also recognizes that in two (non-material) respects Roy can be distinguished: (1) Roy was badly wounded, but unlike Luis, was not killed; and (2) Luis's conduct, stemming as it did from mental illness, was not blameworthy (as was Roy's).   The court also acknowledges that the only competent witnesses to the events are the defendant officers, as Luis is dead and his sister neither witnessed the shooting nor has the mental capacity to testify.  (As plaintiff's counsel candidly stated at oral argument, "the facts are what they are.").   These differences do not, however, detract from the fundamental teaching of Roy that in an excessive force case judgment will enter for an accused officer unless no jury on the facts could find that a reasonable officer would not have made the same choice in the same circumstances.